CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

JUL 25 2019

JULIA C. DUDLEY, CLERK
BY:  s/ MARTHA L. HUPP
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| JUDY T., | ) | |
| Plaintiff, | ) | Civil Action No. 4:18-cv-00028 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | By:   Joel C. Hoppe |
| Defendant. | ) | United States Magistrate Judge |

Plaintiff Judy T.[1] ("Judy") asks this Court to review the Commissioner of Social

Security's ("Commissioner") final decision denying her applications for disability insurance

benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social

Security Act (the "Act"), 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by referral

under 28 U.S.C. § 636(b)(1)(B). ECF No. 14. Having considered the administrative record, the

parties' briefs, and the applicable law, I cannot find that substantial evidence supports the denial

of benefits in this case. Accordingly, I recommend that the decision be reversed and the case

remanded for further proceedings.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see

also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts refer to plaintiffs in such cases only by their first names and last initials.

1

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant

work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).[2] The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

In the summer of 2013, Judy filed for DIB and SSI alleging that she had been unable to work since January 1, 2013, because of post-traumatic stress disorder ("PTSD"), anxiety, and panic attacks. *See* Administrative Record ("R.") 72, 82, 201–02, 207–09, ECF No. 12-1. Judy was fifty-three years old, or a "person closely approaching advanced age" under the regulations, on her alleged disability onset date. R. 72, 82; 20 C.F.R. §§ 404.1563(d), 416.963(d). Disability Determination Services ("DDS"), the state agency, denied her claims initially in February 2014, R. 71–91, and upon reconsideration that August, R. 92–117. On May 16, 2016, Judy appeared with counsel and testified at an administrative hearing before ALJ Brian Rippel. *See* R. 35–69. A vocational expert ("VE") also testified at this hearing. R. 55–69.

ALJ Rippel issued an unfavorable decision on July 11, 2016. R. 17–29. He found that Judy's PTSD, anxiety disorder, and depression were "severe" medically determinable impairments, R. 19–20, during the relevant period, R. 29. Her chronic obstructive pulmonary disease ("COPD") had no more than a minimal effect on her ability to work; thus, it was not a severe impairment. R. 20. Judy's severe impairments did not meet or medically equal the pertinent Listings because they caused only "mild" restrictions in Judy's daily activities and

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

"moderate difficulties" in her social functioning and ability to maintain concentration,

persistence, or pace. R. 20–21 (citing Ex. 1E). ALJ Rippel then evaluated Judy's residual

functional capacity ("RFC") and found that she could "perform a full range of work at all

exertional levels but with the following nonexertional limitations:"[3] simple, routine tasks;

occasional interaction with other people; and low stress work with occasional independent

decision making and changes in the workplace setting. R. 22. Based on this RFC finding and the

VE's testimony, ALJ Rippel concluded at step four that Judy was not disabled after January 1,

2013, because she could still do her past work as an "order filler", as that "medium"[4] exertion

job is generally performed in the economy. R. 27–28; *see* R. 56–59. Alternatively, ALJ Rippel

concluded at step five that, based on Judy's RFC, education, work experience, and age in

January 2013, she could perform certain other unskilled medium-exertion jobs that existed in the

national economy. R. 28–29; *see* R. 56–60. The Appeals Council declined to review the ALJ's

decision, R. 1–4, and this appeal followed.

## III. Discussion

Judy challenges ALJ Rippel's evaluation of her impairment-related limitations at

different steps in his decision. *See generally* Pl.'s Br. 15–16 (step two), 17–22 (RFC), ECF No.

17. Having reviewed the full record, I conclude that ALJ Rippel's RFC analysis "contains too

---

[3] The regulations classify "jobs according to the physical exertion required to perform them." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1990). A physical RFC for "a full range of work at all exertional levels," R. 22, means the claimant can lift "objects weighing more than 100 pounds at a time" and frequently carry "objects weighing 50 pounds or more," 20 C.F.R. §§ 404.1567(e), 416.967(e). "[F]unctional limitations or restrictions caused by medical impairments and related symptoms . . . are characterized as exertional or nonexertional." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). A "nonexertional" limitation is any work-related functional restriction that does "not depend on an individual's physical strength." *Id.* at *6. Although "mental impairments usually affect nonexertional functions, they may also limit exertional capacity by affecting" the person's ability to sit, stand/walk, lift/carry, or push/pull. *Id.*

[4] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c).

4

little logical explanation" about how he "weighed significant evidence related to [Judy's] mental-health treatment," *Thomas v. Berryhill*, 916 F.3d 307, 312 (4th Cir. 2019), and specific symptom-related physical and mental limitations identified by Judy and her healthcare providers, *see* Pl.'s Br. 17–20. Thus, because I "cannot gauge the propriety of the ALJ's RFC assessment, [I] cannot say that substantial evidence supports the ALJ's denial of benefits." *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 663 (4th Cir. 2017).

A claimant's RFC represents her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite her medical impairments and related symptoms.[5] SSR 96-8p, 1996 WL 374184, at *2 (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the [claimant's] record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam), and it should reflect any credibly established "functional limitations or restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities," SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio*, 780 F.3d at 638–40; *Reece v. Colvin*, 7:14cv428, 2016 WL 658999, at *6–7 (W.D. Va. Jan. 25, 2016),

---

[5] "Symptoms" are the claimant's own description of her medical impairment. 20 C.F.R. §§ 404.1528(a), 416.928(a). The regulations set out a two-step process for ALJs to evaluate symptoms as part of the RFC assessment. *See Lewis*, 858 F.3d at 865–66; 20 C.F.R. §§ 404.1529, 416.929. "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Lewis*, 858 F.3d at 866. Second, assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [her] ability," *id.*, to work on a regular and continuing basis, *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015). "The second determination requires the ALJ to assess the credibility of the claimant's statements about symptoms and their functional effects" after considering all the relevant evidence in the record. *Lewis*, 858 F.3d at 866; *see Mascio*, 780 F.3d at 639; *Hines*, 453 F.3d at 565. The ALJ must give specific reasons supported by "references to the evidence" for the weight assigned to the claimant's statements, *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013), and, when necessary, he should "explain how he decided which of [those] statements to believe and which to discredit," *Mascio*, 780 F.3d at 640. A reviewing court will uphold the ALJ's credibility determination if his articulated rationale is legally adequate and supported by substantial evidence in the record. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)).

*adopted by* 2016 WL 649889 (W.D. Va. Feb. 17, 2016). The ALJ has broad (but not unbounded)

discretion to determine whether an alleged functional limitation is supported by or consistent

with the medical and other relevant evidence in the claimant's record. *See Perry v. Colvin*, No.

2:15cv1145, 2016 WL 1183155, at *5 (S.D. W. Va. Mar. 28, 2016) (citing *Oppenheim v. Finch*,

495 F.2d 396, 397 (4th Cir. 1974)). Generally, a reviewing court will defer to the ALJ's RFC

finding when it is clear that he considered all the relevant evidence under the correct legal

standards, *see Brown v. Comm'r of Soc. Sec.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and he built

an "accurate and logical bridge from that evidence to his conclusion," *Woods v. Berryhill*, 888

F.3d 686, 694 (4th Cir. 2018) (internal quotation marks and brackets omitted).

* * *

Judy used to work as an order filler for a mail-order company. R. 56, 239–41. In January

2013, some of her colleagues noticed that her anxiety was "interfering with her ability to work."

R. 42–43; *see also* R. 296. Her employer told her to take two weeks off so she could relax and

focus on getting her "life right." R. 43. Just as Judy was about to return to work, however, her

son got into trouble with the police. R. 296. The SWAT team "rushed into [Judy's] home by

breaking her door down with a battering ram and told her to get on the floor." *Id.* Officers

"manhandled her to [the] ground" and handcuffed her while they searched the home. R. 325; *see*

*also* R. 296, 360. Judy did not return to work after this incident. *See* R. 42–44, 293, 325.

Judy established care with Susan Weeks, NP, on February 18, 2013. R. 325–27. The

Xanax and Celexa Judy had started taking two weeks earlier were not controlling her severe

anxiety, panic attacks, shakiness, and "impaired concentration/indecisiveness." R. 325. On exam,

NP Weeks observed that Judy appeared "shaky" with an "anxious" mood and affect, but her

grooming, speech, memory, and thought content were within normal limits. R. 325–27. She

quadrupled Judy's daily dose of Celexa, substituted Klonopin (clonazepam) for Xanax, and told

Judy to stay home from work for another two weeks. *See id.* Judy followed up with NP Weeks

about once a month through September 2013. She consistently complained of "moderate" to

"severe" anxiety, depression, agoraphobia, impaired concentration, and frequent panic attacks

even though she generally reported "good compliance" with prescribed medications. *See, e.g.*, R.

301, 307–08, 310, 312, 315. NP Weeks observed that Judy was always anxious or depressed, R.

301–02, 307, 310, 312, 315, 318, 321, 323; and that she sometimes exhibited either "slow" or

"pressured" speech, R. 312, 315, 319, 323. In July 2013, NP Weeks opined that Judy was not

"ready to return to work due to her post-traumatic stress disorder [and] panic attacks. Her main

disability [was] her ability to concentrate, plus her hands continually sh[ook], so dexterity [was]

also an issue." R. 308.

   Judy established care with psychiatrist Joseph Mingoia, M.D., on April 29, 2013. R. 296–

99. She reported feeling "paranoid and hypervigilant," isolating herself from others, and having

"panic attacks where she has shortness of breath and uncontrollable shaking." R. 297. She

"denied any chest pain or palpitations" during those episodes. *Id.* On exam, Dr. Mingoia

observed that Judy was anxious, "visibly shaking," exhibited "partial insight" and "some

paranoia," and seemed fixated "on her anxiety and her traumatic experience with the police." *See*

R. 298. Her judgment, thought content, attitude, and speech were normal. *Id.* He increased her

Zoloft to 150mg, substituted 1mg Klonopin three times daily for the Xanax, and referred Judy to

individual counseling. *Id.* On June 3, Judy told Dr. Mingoia that the Zoloft had "not had any

noticeable effect on her anxiety." R. 295. She was nervous and "visibly shaking" on exam. *Id.*

Her speech was not pressured, but she was still somewhat paranoid. *Id.* Dr. Mingoia increased

the Zoloft to 200mg (the maximum dose, R. 292) and added 150mg Seroquel to target "anxiety

and paranoia." R. 296. Judy did not notice any improvement on Zoloft 200mg. R. 292. Seroquel

made "her like a 'zombie'" and did not help her anxiety or paranoia "at all." *Id.* Extreme
("10/10") anxiety, shaking, and daily panic attacks continued to bother her. R. 292–93. Mental-
status exam notes from psychiatrist Chintan Shah, M.D., reflect that Judy was "anxious" and had
a "notable" tremor in her upper extremities in August and September 2013. R. 293, 295. Her
"attention and concentration appear[ed] intact" on both visits. *Id.* Dr. Shah prescribed 300mg
Neurontin (gabapentin) three times daily for anxiety and encouraged Judy to try to reduce the
amount of Xanax she took every day. R. 292, 294. Neurontin did not help Judy's tremor. R. 460.

In November 2013, Judy submitted paperwork to DDS explaining how persistent anxiety
and depression impacted her daily life. *See* R. 220–27, 246–47, 248–51. She spent most days
sitting "in a daze in [her] bedroom" watching television or going on the computer. R. 220. Her
body shook "all the time," which made it "hard to do anything," R. 251, and caused her muscles
to ache "continuously," R. 246. Shaking, memory problems, and "lack of concentration" made
doing "any chores very difficult." R. 251; *see also* R. 222–23, 248. Judy could feed the dog,
prepare simple meals, do laundry, load and unload the dishwasher, sweep, and mop when
"encouraged" to do so, but it would take her all day to finish most of those chores. R. 222; *see
also* R. 220 (stating that she "tr[ies] to clean but can't [and] tr[ies] to focus on something each
day but can't."). She could drive, but she typically rode in a car when leaving her house, in part
because she needed someone to accompany her to appointments. *See* R. 223–24, 248. Her
boyfriend did the grocery shopping. R. 251. Judy stayed at home "when at all possible" because
going out made her "very anxious" and triggered panic attacks. R. 251. Oftentimes, she did not
"feel up to showering" and just stayed in her pajamas all day. *Id.*; *see* R. 221.

That winter, Judy connected with Don Tessmann, M.D., and Kristen Patterson, LMHP-E,
at Piedmont Community Services for medication management and counseling. *See* R. 332–36,

360–61. Ms. Patterson saw Judy at least once a month between December 2013 and May 2014. She repeatedly observed that Judy was anxious during their therapy sessions "as evidenced by" her shaking body, trembling voice, and occasional tearfulness. R. 340, 343, 372, 374, 376, 381. Dr. Tessmann also noticed Judy's "considerable" anxiety and tremor on exams in January, February, and April 2014. *See* R. 344–45, 360, 383. He did not note any "obvious deficits" in Judy's recent or remote memory on these visits, *id.*, but her judgment and insight were "lacking" in April, R. 383. Her attention and concentration were generally "goal directed" in February and April. R. 345, 383. Dr. Tessmann prescribed Ambien, Celexa, Trazodone, and Xanax to target Judy's symptoms, *see* R. 345–46, 360–61, 383–85, but her overall psychiatric condition remained the same during this time, R. 385. On Judy's final visit, Dr. Tessmann noted that her "presentation continue[d] with considerable anxiety and hypervention." R. 383.

On March 19, 2014, Judy told Ms. Patterson that her anxiety symptoms were getting worse and that her tremor continued to interfere with "routine activities." R. 373; *see* R. 343 (Feb. 7, 2014); R. 372 (Feb. 26, 2014). Judy's "hands and legs trembled severely throughout" this session. R. 374. Ms. Patterson suggested "that inpatient hospitalization may be the most effective treatment given the severity of [her] anxiety," but Judy was "hesitant due to financial constraints." *Id.* On April 2, Ms. Patterson noted that Judy appeared "less anxious" than at her prior session, which Judy thought "may be attributable to [her] taking a full dose of Xanax in the morning and then [as needed] throughout the day." R. 376. Even so, Judy "continued to demonstrate [a] severe level of anxiety. Her hands trembled for the duration of [the] session." *Id.* Six weeks later, Judy "reported some improvement in completing daily activities" when home alone, but she still experienced "shakiness and tearfulness when she ha[d] to be around others regardless of familiarity." R. 386.

9

In April 2014, Dr. Tessmann and Ms. Patterson completed a Mental RFC Assessment describing how Judy's PTSD and anxiety disorder limited her ability to sustain work-related activities during a normal forty-hour workweek. R. 352–55; *see* R. 611–12. "Based on [their] personal assessment," they opined that Judy had "[m]oderate" to "[e]xtreme" limitations in most functional areas. R. 353–55. She could not "tolerate normal levels of stress," "make simple work-related decisions," work with or around other people without being distracted by them, "complete a normal workday and workweek without interruptions from psychologically based symptoms," or "perform at a consistent pace" without taking unreasonable breaks. R. 354–55. Judy was not a malingerer, and she had complied with outpatient counseling and psychotropic treatment during the past four months. R. 352–53.

DDS psychologist Bryce Phillips, Psy.D., reviewed Judy's records in late February 2014. R. 75–79, 85–89. He opined that Judy's "history of anxiety" suggested she "may encounter moderate limitations" dealing with detailed instructions and working around people, but the available "medical evidence indicate[d] that she should be able to perform simple, unskilled work which does not require a great deal of contact with other people." R. 78–79, 88–89. DDS psychologist Julie Jennings, Ph.D., reached a similar conclusion about Judy's mental RFC after reviewing her updated medical records in August 2014. *See* R. 101–04, 113–16. She explained that the mental-status exams showing "anxiety, normal thought content, normal recent/remote memory, and normal concentration" indicated that Judy could "perform simple/routine work in an environment with limited social interactions." R. 103, 115. Neither psychologist identified any limitations on Judy's capacities to adapt to workplace stress, deal with routine changes, or make work-related decisions. *See* R. 79, 89, 103, 115.

In the summer of 2014, Judy established care with Julia Hodnett, NP, and Shannon

10

McNett, LCSW, at Bassett Family Practice. *See* R. 424–28. On July 16, NP Hodnett observed a

"fine general body tremor," which Judy explained had been present "since the police came" to

her home eighteen months earlier. R. 425. On July 30, Judy told Ms. McNett that she had

experienced "constant worr[ied] thoughts and paranoid-type thinking" for the past year. R. 427.

She had "trouble concentrating on things, such as reading or TV[,] nearly every day." *Id.*

(capitalization altered). Ms. McNett suggested that Judy see her every two weeks, but Judy

preferred to meet with NP Hodnett and Ms. McNett once a month on the same date because

"finances [were] an issue." *Id.* Later that day, NP Hodnett observed Judy's mood was "normal,"

but she "continue[d] to have issues with eye contact, slumped posture, and tremor when spoken

to." R. 430.

Judy saw Ms. McNett and NP Hodnett on a regular basis through June 2015, and January

2016, respectively. Most of NP Hodnett's exam notes from the period when Judy was under Ms.

McNett's care indicate that Judy's mood, affect, and speech were all within normal limits. *See,*

*e.g.*, R. 434, 461, 470, 476, 487, 490, 498, 503. Ms. McNett's more detailed mental-status exam

notes show, however, that Judy consistently had an anxious or depressed mood/affect, exhibited

racing and tangential thoughts, and spoke with pressured or rapid speech. R. 436, 442, 449, 454,

458, 464, 467, 472–73, 481, 484. Judy often exhibited "minimal" or "limited" hygiene, R. 428,

436, 441, 457–58, 464, 467, 472–73, 484, and she reported more than once that she had

"bath[ed] only twice weekly [for the] past year," R. 467, 472. Judy also occasionally exhibited

tearfulness, R. 457, 464, 484; limited eye contact, R. 436, 442; paranoid, rigid, or "all or

nothing" thought processes, R. 442, 448; and difficulty focusing, R. 427, 457, 464. Ms. McNett

often encouraged Judy to spend time outside her bedroom and to leave her house, even if she had

to stay in the car. *See* R. 448, 453, 457.

NP Hodnett prescribed different combinations and dosages of Celexa, Risperdal, Pristiq, Propranolol, Topamax, Wellbutrin, and Xanax. Judy reported temporary improvement on some of these medications. *Compare* R. 443–44, 446, 493, 499 (improvement), *with* R. 436, 438, 441, 448, 450, 453–54, 457, 466, 469–70, 472, 475, 508, 511, 514, 518 (no improvement or worse). In September 2014, for example, she told Ms. McNett that she was "feeling much better since starting Risperdal a few weeks ago" and she recently had her "first happy day" in two years. R. 446. By late October, however, Judy reported "feeling 'all to pieces' again." R. 448. She had "maybe 1 good day a month" even though she took Celexa, Risperdal, Topamax, and Xanax as prescribed. *Id.* Judy reported "consistently leaving her room more and working on chores around the home," which Ms. McNett thought represented "some overall improvement" in Judy's day-to-day functioning. *See id.*

In January 2015, Judy reported feeling the same as "how she [did] when the police raid first occurred" two years earlier. R. 457. That April, she was voluntarily admitted to an inpatient psychiatric unit for three days after she threatened to kill herself. *See* R. 483–84, 486, 489. On May 20, Ms. McNett noted that Judy's mood and affect were still "depressed and anxious, but overall increasingly stable." R. 494. She explained that Judy had hit "a plateau in treatment" and recommended that she switch from individual therapy to Intensive Crisis Stabilization ("ICS") group therapy. *See* R. 483–84, 493. Judy did not attend her ICS intake appointment, however, because "she was back on her medications now, was doing very well, and did not believe she needed ICS services" as of late spring 2015. R. 399. Judy's mood was "positive" at her final visit with Ms. McNett in June 2015. R. 500. NP Hodnett's later exam notes (Sept. 2015–Jan. 2016) show that Judy was "pleasant," but always exhibited a depressed mood, flat affect, and minimal hygiene. R. 509, 512, 514, 519.

12

In the spring of 2015, NP Hodnett and Ms. McNett each completed a Medical Source Statement (Mental) describing how Judy's chronic "severe anxiety," R. 394, "major depression, melancholic type," and PTSD, R. 391, limited her ability to sustain work-related activities during a normal forty-hour workweek. *See* R. 391–93 (McNett), 394–96 (Hodnett). NP Hodnett opined that Judy had "moderate," "marked," or "extreme" limitations in most functional areas, R. 395, which was generally consistent with Dr. Tessmann's and Ms. Patterson's assessment from twelve months earlier. *See* R. 352–55. Ms. McNett, on the other hand, opined that Judy had "extreme" work-preclusive limitations in nearly all functional areas—especially social interaction and sustained attention and persistence. R. 392–93. She also noted that Judy "struggle[d] to bathe regularly and frequently appear[ed] disheveled." R. 391.

Judy reestablished care at Piedmont Community Services in the fall of 2015. *See* R. 515. Mary Harper, QMHP-A, observed that Judy was anxious, depressed, tearful, and self-guarded during her intake appointment in mid-November. R. 402. Judy also had trouble "understanding and answering questions" and "appeared to have [a] difficult time [staying] focused." *Id.* Ms. Harper recorded many of the same abnormal findings—as well as "slowed" or "pressured" speech—at Judy's follow-up visits in December 2015, January 2016, and March 2016. R. 412–13, 422–23, 587. Psychiatrist Conrad Daum, M.D., observed that Judy's memory, attention, and concentration were "adequate" and "OK" on examinations during the same time. R. 417, 577. Dr. Daum prescribed Abilify, Pristiq, Propranolol, Topamax, and Xanax. R. 418, 579.

In May 2016, Judy testified that she could not work anymore because she panics around people and she "can't focus" on what she is supposed to do. R. 44; *see also* R. 48–49. Her symptoms had gotten worse since she stopped working in January 2013. R. 45. Judy left her house "maybe twice a month" to visit her ailing mother and father, R. 46, who lived about an

hour away, R. 55. *But see* R. 41 ("How many days do you typically drive some? [Answer:]

Maybe once a week."); R. 55 ("[Y]ou told me that you drive weekly. Where do you normally go

to or from? [Answer:] To my mom's."). Judy did the laundry, but her boyfriend did the other

household chores and shopping. R. 46–48. She did not do anything while he was at work all day.

*See* R. 47, 55.

B.    *The ALJ's Decision*

ALJ Rippel considered Judy's mental impairments, symptoms, and alleged functional

limitations throughout his written decision. R. 20–21, 22–27. At step two, he found that her

PTSD, anxiety disorder, and depression were "severe" medical impairments because they

significantly limited her "ability to perform basic work activities," R. 20–21, which, according to

the regulations, include physical functions like lifting, carrying, or handling, and mental

functions like interacting appropriately with people and dealing with changes in a work setting,

20 C.F.R. §§ 404.1521(b), 416.921(b). Judy's mental impairments were not presumptively

disabling, however, because they caused only "mild" restrictions in her activities of daily living

and "moderate difficulties" with both social functioning and maintaining concentration,

persistence, or pace. R. 20–21 (citing Ex. 1E). ALJ Rippel based these ratings on Judy's report to

DDS in November 2013 that she had few social activities, "lived with family, spent some time

sitting in a daze but also tried to watch television, clean[ed], f[ed] the dogs, and [went] on the

computer . . . . prepared simple meals," did household chores, but needed to take breaks, shopped

in stores, and could go out alone. *Id.*; *see* R. 220–26 (Ex. 1E).

Turning to the RFC assessment, ALJ Rippel summarized Judy's hearing testimony about

her symptoms, R. 22, portions of her treatment history and clinical findings (both abnormal and

unremarkable) on several mental-status exams, R. 23–24, and the conflicting medical-source

opinions about Judy's mental illness and resulting work-related functional limitations, R. 25–27.
He found that Judy retained the RFC for "a full range of work at all exertional levels, but with
the following nonexertional limitations" to accommodate her severe PTSD, anxiety, and
depression: simple, routine tasks; occasional interaction with other people; and low stress work
with only occasional independent decision making and changes in the workplace setting. R. 22;
*see* R. 23, 27. This RFC was "supported by the psychological treatment record, clinical findings
on mental status examination[s]," Judy's "reported activities of daily living," R. 27, and the DDS
psychologists' similar—but slightly less restrictive—medical opinions to the extent they were
"consistent with [Judy's] psychological treatment records," R. 25.

ALJ Rippel gave "greatest weight" to the DDS psychologists' reviewing-source opinions
identifying at most "moderate" limitations in certain functional areas, R. 25; "less weight" to Dr.
Tessmann and Ms. Patterson's treating-source opinion identifying "marked" to "extreme" work-
preclusive limitations in all functional areas, R. 25–26; and "little weight" to NP Hodnett's and
Ms. McNett's opinions identifying similarly work-preclusive limitations, R. 26–27. He cited
three reasons why the providers' opinions were not supported by or consistent with their "own
treatment records," R. 25, 26, 27, whereas the DDS opinions were "consistent with [Judy's]
psychological treatment records," R. 25. First, Judy "conservatively treated her mental
impairments during the relevant period and had improvement with medication compliance. She
had only one reported hospitalization . . . , which seem[ed] related to her non-compliance with
medication as she was noted to be stabilized shortly thereafter with medication." R. 24–25, 26,
27 (citing R. 399, 489). Second, the record did not document any "witnessed panic attacks or
emergency room visits for panic or chest pain during the relevant period." *Id.* Third, "clinical
findings on mental status exam[s] were minimal and generally noted [Judy] was cooperative with

normal speech, goal directed thought processes, some paranoid thought content, and intact

attention and concentration." *Id.* (citing Exs. 1F, 4F, 7F, 11F, 12F, 14F).

ALJ Rippel gave two additional reasons for doubting Judy's May 2016 testimony that she

could not work because she had extreme anxiety and some paranoid thoughts, "difficulty being

around people, inability to focus [and] perform, and did not like to leave her home." R. 22; *see*

R. 44–55. First, Judy gave "inconsistent testimony" about her social isolation because initially

she testified that she "drove once a week and then stated she only left her house twice a month to

visit her parents. . . . [T]reatment records note she was driving and had monthly psychological

appointments." R. 24 (citing Exs. 1F, 4F, 7F, 11F, 12F, 14F). Second, Judy had "described daily

activities that [were] not as limited to the extent one would expect given [her] complaints of

disabling symptoms and limitations." *Id.* (citing Ex. 1E). As before, ALJ Rippel based this

finding on Judy's report in November 2013 that she "lived with family, spent some time sitting

in a daze but also tried to watch television, clean, feed the dogs, and go on the computer . . . .

prepared simple meals," did household chores, but needed to take breaks, shopped in stores and

could go out alone. *Id.*

*C.      Analysis*

The Commissioner "has specified the manner in which an ALJ should assess a claimant's

RFC." *Thomas*, 916 F.3d at 311 (citing SSR 96-8p, 1996 WL 374184). First, because RFC is by

definition "a function-by-function assessment based upon all of the relevant evidence of [the

claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ

must identify the claimant's impairment-related functional restrictions that are supported by the

record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). Second, the ALJ must provide a

"narrative discussion describing" how specific medical facts and nonmedical evidence "support[]

each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explaining how he weighed any conflicting or inconsistent evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. The ALJ does not need to mention every piece of evidence, but he "must evaluate the record fairly" and he "may not ignore . . . evidence that is contrary to the [nondisability] ruling" generally, *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *see Lewis*, 858 F.3d at 869–70, or to specific conclusions in his RFC assessment, *see, e.g.*, *Brown*, 873 F.3d at 267–72 (medical opinions); *Lewis*, 858 F.3d at 869–70 (abnormal clinical findings); *Monroe*, 826 F.3d at 189–91 (claimant's testimony). "Otherwise, it is impossible for a reviewing court to tell," *Golembiewski*, 322 F.3d at 917, whether the decision "was based on the entire record and supported by substantial evidence," *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). ALJ Rippel's decision does not meet these standards.

To start, ALJ Rippel did not explain why his RFC finding addresses only Judy's *mental* "nonexertional" capacities to perform *mental* work-related functions. R. 22. Judy alleged that her severe anxiety and PTSD affected her physically, as well as mentally and emotionally. Pl.'s Br. 15–17; *see, e.g.*, R. 246, 251, 293, 295, 297, 333, 342, 371, 373, 376, 386, 426, 460, 466–67. She suffered frequent—sometimes daily—panic attacks that caused shortness of breath (but not chest pain) and uncontrollable shaking. R. 289, 293, 307, 312, 315, 409, 472, 480, 483, 493, 499–500, 588. Isolating herself and lying down "for 30 or 40 minutes" at a time helped, R. 472; *see also* R. 247, 295, 441, but being around people could trigger or exacerbate an episode, *see* R. 340, 371, 373, 375, 381, 386, 436, 457. Judy's body trembled almost constantly, R. 291, 292–93, 343, 376, 386, 430, 457, 460–62, 466, which interfered with "routine activities," R. 373, and made "it hard to do anything" around the house, R. 251. *See, e.g.*, R. 343 (using scissors), 381 (signing name). Dr. Tessmann, Dr. Shah, NP Weeks, NP Hodnett, Ms. Patterson, and Ms. McNett all observed

that Judy's hands, legs, or body shook on exams throughout the relevant period. R. 289, 290,

293, 295, 312, 315, 333, 338, 340, 343, 344–45, 360, 372, 374, 376, 383, 425, 430, 457, 464,

467, 509. In late July 2013, NP Weeks opined that Judy was not "ready to return to work due to

her [PTSD] & panic attacks. Her main disability [was] her ability to concentrate, plus her hands

continually shake, so dexterity [was] also an issue." R. 308.

　　　　ALJ Rippel did not mention NP Weeks's opinion (or her clinic notes) or any of Judy's

statements to both DDS and her healthcare providers that frequent panic attacks and a persistent

body tremor limited her physical capacities to perform routine daily tasks, including those that

required lifting, carrying, gripping, and handling objects. R. 22–28. He did cite a few instances

where Judy was "visibly shaking" or exhibited an upper-extremity tremor on mental-status

exams, R. 23–24, but he "never explained how he concluded—*based on this evidence*—that

[Judy] could actually perform the tasks required by 'medium work,' such as lifting up to 50

pounds at a time [and] frequently lifting up to 25 pounds," *Woods*, 888 F.3d at 694. *See* R. 22

(finding that Judy retained the physical capacity to perform "a full range of work at all exertional

levels" and did not have any limitations on manual dexterity); R. 28 (denying benefits because

Judy could return to her past "medium" exertion work as generally performed). The

Commissioner asserts that ALJ Rippel "reasonably determined that no *physical* limitations were

necessary" to accommodate Judy's tremor "beyond limiting [her] to 'low stress work,'" Def.'s

Br. 23, ECF No. 19, but that rationale is not apparent from the face of the ALJ's decision, *see*

*Bates v. Berryhill*, 726 F. App'x 959, 960 (4th Cir. 2018) (citing *Patterson v. Bowen*, 839 F.2d

221, 225 n.1 (4th Cir. 1988)); *Fox v. Colvin*, 632 F. App'x 750, 755–56 (4th Cir. 2015) (per

curiam). Accordingly, ALJ Rippel's failure to "build an accurate and logical bridge from the

evidence he recounted to his conclusion" about Judy's RFC is reversible error and requires

remand. *Woods*, 888 F.3d at 694.

Next, ALJ Rippel "did not sufficiently explain how []he weighed significant evidence related to [Judy's] mental-health treatment," *Thomas*, 916 F.3d at 312, that directly undermined his rationale for giving "greatest weight" to opinions from the DDS psychologists who reviewed Judy's medical records in 2014, while at the same time giving "less" and "little weight" to the more restrictive (but generally consistent) opinions from the psychiatrist, nurse practitioner, and mental-health counselors who treated Judy's mental illness on a regular basis throughout the relevant three-year period, *see Woods*, 888 F.3d at 695. Generally, an ALJ should accord more weight to opinions from medical professionals who personally treated or examined the claimant than to those from consultants who merely reviewed her medical records. *Id.* (medical doctors); *Foster v. Astrue*, 826 F. Supp. 3d 884, 886–87 (E.D.N.C. 2011) (nurse practitioners, counselors). The ALJ may, however, credit a reviewing-source opinion when that opinion is consistent with "the record as a whole" and "has sufficient indicia of supportability in the form of a high-quality explanation and a significant amount of substantiating [medical] evidence," *Woods*, 888 F.3d at 695 (quotation marks omitted). A reviewing court "must defer to the ALJ's assignments of weight" among differing opinions unless his underlying findings or rationale "are not supported by substantial evidence in the record." *Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir. 2015).

ALJ Rippel did not cite any "specific medical facts," SSR 1996 WL 374184, at *7, to support his conclusion that clinical findings on Judy's mental-status exams were "minimal" and "generally" showed "normal speech, goal directed thought processes, some paranoid thought content, and intact attention and concentration," R. 24–27 (citing Exs. 1F, 4F, 7F, 11F, 12F, 14F). *Cf. Monroe*, 826 F.3d at 191 (reversing and remanding where "the ALJ did not specify what 'objective evidence' or what aspects of Monroe's 'treatment history' he was referring to"

19

when weighing conflicting medical opinions). Those findings do appear in a few mental-status

exam records, *see, e.g.*, R. 293, 295, 298, 345, 383, and in several of NP Hodnett's progress

notes from when Judy also saw Ms. McNett for counseling, *see, e.g.*, R. 434, 461, 470, 476, 487,

490, 498, 503. But, many more of Judy's exam notes show that she often spoke abnormally fast

or slow, *see, e.g.*, R. 312, 315, 319, 323, 412–13, 422–23, 436, 442, 449, 454, 458, 464, 467,

472–73, 481, 484, 587; exhibited tangential, racing, rigid, or paranoid thought processes, *see,*

*e.g.*, R. 436, 442, 449, 454, 458, 464, 467, 472–73, 481, 484; and had some trouble focusing

during medical appointments, *see* R. 402, 412–13, 422–23, 427, 457, 464, 587. And, as noted,

they also show that Judy was often so anxious that her body or voice trembled on exam even

though she was familiar with her providers. *See, e.g.*, R. 289, 290, 293, 295, 312, 315, 333, 338,

340, 343, 344–45, 360, 372, 374, 376, 383, 425, 430, 457, 464, 467, 509. ALJ Rippel cited some

of these abnormal findings in his summary of the medical record, R. 23–24, but he did not

explain how they factored into his apparent conclusion that these providers' exam findings were

"minimal" and "generally" unremarkable, *see* R. 25–27. *See Lewis*, 858 F.3d at 869 ("An ALJ

has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts

that support a finding of nondisability while ignoring evidence that points to a disability

finding." (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). Moreover, "[b]ecause

symptoms of mental illness may wax and wane over the course of treatment," the fact that Judy

exhibited adequate attention or intact memory "on certain specific occasions is not [necessarily]

inconsistent with the conclusion that she is unable to work." *Testamark v. Berryhill*, 736 F.

App'x 395, 398–99 (4th Cir. 2018).

    ALJ Rippel's rationale that Judy received "only conservative" psychiatric treatment and

"had improvement with medication compliance" falls short for two reasons. First, although an

ALJ may consider the conservative nature of a claimant's medical treatment—among other factors—in judging the credibility of her symptoms and alleged functional limitations, he must explain how he weighed any evidence suggesting that the claimant "required more aggressive treatment yet received conservative treatment for other reasons," *Dunn*, 607 F. App'x at 273. *See, e.g.*, *Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986) ("A claimant may not be penalized for failing to seek treatment she cannot afford."). ALJ Rippel recognized that Judy received medication management and outpatient counseling on a regular basis between February 2013 and March 2016. *See generally* R. 289–99, 301–27, 329–87, 398–422, 424–520. What he did not mention, however, is *any* of the evidence that Judy could not afford the more frequent or aggressive treatment that her providers recommended.

Judy lost her health insurance in the fall of 2013, R. 301, 333, followed by her access to the family car in the spring of 2014, R. 375. She repeatedly told providers that she could not afford recommended psychiatric treatment—including certain prescription medications, R. 345, 360, 385, 486, 502, and more intensive outpatient counseling, R. 295, 312, 333, 427, 436, 453, 457. In April 2014, Ms. Patterson suggested "that inpatient hospitalization may be the most effective treatment given the severity of Judy's anxiety." R. 374. Judy was "hesitant due to financial constraints," but she "agreed to explore inpatient treatment . . . upon obtaining insurance." *Id.* Judy got "GAP insurance coverage" in January or February 2015. *See* R. 453, 463. That April, she was admitted to a psychiatric hospital for three days because she threatened to kill herself. *See* R. 483–84, 486, 489. Judy might have been "[w]aiting on Medassist" to refill her Pristiq when she was hospitalized, *see* R. 483, 486, which undermines the ALJ's suggestion that Judy's "non-compliance with medication" was completely within her control, R. 24–27. ALJ Rippel needed to explain how he weighed this evidence in concluding that the "conservative"

nature of Judy's psychiatric treatment was at odds with her providers' statements. *See Dunn*, 607 F. App'x at 273. He did not even mention it.

Second, ALJ Rippel did not adequately explain how he concluded that Judy's psychiatric treatment was "conservative" or that she saw "improvement with medication compliance." R. 24–25, 26, 27 (citing R. 399, 489). Presumably, the latter conclusion was based on his findings that Judy "was noted to be stabilized" on medication shortly after leaving the hospital. R. 25–27 (citing R. 399, 489). That finding, however, relies entirely on Judy's *own* report during a phone call with a mental-health counselor that Judy "did not believe she needed" Intensive Crisis Stabilization therapy in May 2015 because *she* thought her depression had "improved" since restarting Pristiq. R. 24, 399, 489. Ms. McNett noted that Judy's "depressed and anxious" mood seemed "overall increasingly stable" on May 20, but she still encouraged Judy to seek more aggressive mental-health treatment. R. 494. Contrary to the ALJ's suggestion, "[t]here is nothing objective," *Craig v. Chater*, 76 F.3d 585, 590 n.2 (4th Cir. 1996), about a medical professional writing, without more, that he heard Judy say she was "doing very well," R. 399. And, as ALJ Rippel pointed out in his summary of the medical evidence, Judy soon reported that she was "struggling with depression a lot, [had] mood swings, . . . poor self-care, crying spells, panic attacks around people, paranoia, and social isolation." R. 24 (citing R. 400–01). *Cf. Oliver v. Colvin*, Civ. Action No. 9:13-516, 2014 WL 2155241, at *5 (D.S.C. May 22, 2014) (reversal and remand required where ALJ's decision did not explain internally inconsistent findings). Thus, the fact that Judy reported feeling well for a few weeks after restarting Pristiq does not support the ALJ's finding that her symptoms "stabilized" with medications. R. 25–27; *cf. Vincent v. Colvin*, No. CIV-15-610, 2016 WL 5373031, at *7 (W.D. Okla. Sept. 26, 2016) (ALJ's failure to consider claimant's "isolated comments" that she "'was doing well'" after hip surgery "in the

context in which they were made," including that the claimant still walked with a limp and occasionally used a walker, precluded substantial-evidence review).

Moreover, despite Judy's limited resources, her full treatment record documents frequent counseling and "an ever-changing combination of medications and dosages," *Jelinek v. Astrue*, 662 F.3d 805, 807 (7th Cir. 2011), of more than a dozen sedatives, antidepressants, and antipsychotic drugs to target Judy's extreme anxiety, paranoia, and depression over a three-year period. Providers stopped Celexa, Cymbalta, Klonopin, Seroquel, and Wellbutrin because Judy denied meaningful improvement, reported intolerable side effects, or both. *See, e.g.*, R. 292–94 (Seroquel, Zoloft); R. 297, 444, 579 (Celexa); R. 323 (Klonopin); R. 469–70 (Wellbutrin); R. 484 (Cymbalta). Neurontin, Pristiq, Risperdal, Trazodone, and Xanax each provided some measure of temporary relief, but, according to Judy's healthcare providers, none controlled her symptoms enough for her to work full time. *See* R. 291, 460 (Neurontin); R. 399, 470, 486, 508–09 (Pristiq); R. 463, 469 (Risperdal); R. 570 (Trazodone), R. 295, 376 (Xanax). ALJ Rippel did not explain how any of this evidence—most of which he did not mention in his decision—factored into his conclusion that Judy "only conservatively treated her mental impairments during the relevant period and had improvement with medication compliance," R. 25–27. *See Wilson v. Colvin*, No. 8:15cv4185, 2016 WL 6471904, at *15 (D.S.C. Oct. 19, 2016) (finding that the ALJ's failure to discuss "the number of medications Plaintiff was taking, as well as the number of times his medications had to be changed due to their apparent ineffectiveness" in characterizing plaintiff's outpatient psychiatric treatment as "conservative" precluded substantial-evidence review).

Finally, ALJ Rippel's discussion of Judy's chronic mental illness gives the impression that he "seize[d] on insignificant inconsistencies . . . while overlooking the record's broader

import." *Testamark*, 736 F. App'x at 399. His conclusion that Judy's "social isolation" was not as severe as she alleged throughout the relevant three-year period because in May 2016 Judy testified "inconsistently" that she left her house "about once a week" and "about twice a month," R. 24, is just one example. ALJ Rippel also pointed out that Judy's "treatment records note [she] . . . had monthly psychological appointments," but he did not explain why that information suggested Judy's "social isolation" was not as severe as she and her providers alleged, R. 24–27 (citing Exs. 1F, 4F, 7F, 11F, 12F, 14F). On the contrary, these medical records document Judy's consistent complaints that her anxiety, paranoia, and panic attacks were so debilitating that she rarely left her house *except* to attend monthly medical appointments. *See, e.g.*, R. 295, 297–98, 301, 307, 312, 315, 318, 338, 340, 343, 376–77, 382, 386, 401–03, 409, 436, 441, 450, 453, 457, 566, 475. Judy also reported significant trouble completing basic tasks or daily activities at home, such as bathing on a regular basis, clearing her bedroom, and spending time with family and friends. *See, e.g.*, R. 297, 343, 374, 377, 382, 386, 402–03, 412, 448, 467, 472, 484. ALJ Rippel did not explain how any of this evidence factored into his conclusion that Judy's "daily activities . . . [were] not as limited to the extent one would expect" given her complaints of disabling anxiety, PTSD, and depression, R. 24. *See Woods*, 888 F.3d at 695 ("An ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which she can perform them.").

* * *

The Court takes no position on whether Judy is entitled to disability benefits after January 2013. "A full explanation by the ALJ [was] particularly important in this case" because Judy's record included "a fair amount" of medical and other evidence supporting her alleged symptoms and functional limitations. *Radford v. Colvin*, 734 F.3d 288, 296 (4th Cir. 2013). Yet, ALJ

24

Rippel's written analysis was so conclusory, and at points so materially incomplete or contradictory, that I am left to guess about how the ALJ weighed all the relevant evidence and why he concluded, based on this evidence, that Judy could perform contested work-related functions on a regular and continuing basis. *See Ricky C. v. Soc. Sec. Admin.*, No. 4:17cv20, 2018 WL 3567288, at *3–4, *7 (W.D. Va. June 22, 2018), *adopted by* 2018 WL 3551530 (W.D. Va. July 24, 2018). Thus, because I "cannot gauge the propriety of the ALJ's RFC assessment, [I] cannot say that substantial evidence supports the ALJ's denial of benefits." *Patterson*, 846 F.3d at 663. On remand, the Commissioner must consider and apply the applicable legal rules to all the relevant evidence in the record, explain how any material inconsistencies or ambiguities were resolved at each critical stage of the determination process, and provide an accurate, logical description of how specific evidence in the record supports each conclusion in the RFC assessment.

## IV. Conclusion

For the foregoing reasons, I cannot find that substantial evidence supports the Commissioner's denial of benefits in this case. Accordingly, I respectfully recommend that the presiding District Judge **DENY** the Commissioner's motion for summary judgment, ECF No. 18, **REVERSE** the Commissioner's final decision, **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

### <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings

or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to the parties.

ENTER: July 25, 2019

Joel C. Hoppe
United States Magistrate Judge

26